(Surrogate's Court, Cattaraugus County.   April, 1912.)

1. ADOPTION (§ 16*)—SURROGATE'S COURT—VACATION OF ORDER.
   Under Code Civ. Proc. § 2481, subd. 6, an order of adoption made by a surrogate without jurisdiction may be vacated and set aside by him.
   [Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 27, 28; Dec. Dig. § 16.*]

2. ADOPTION (§ 7*)—PROCEEDINGS—JURISDICTION.
   To confer jurisdiction upon a surrogate to make an order confirming an agreement for adoption, the infant's mother being deceased, it was necessary to obtain the father's consent, or the fact of abandonment must exist.
   [Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 7–10; Dec. Dig. § 7.*]

3. ADOPTION (§ 16*)—PROCEEDINGS—VACATION OF ORDER.
   On a father's application for the abrogation of an order confirming an agreement by grandparents for the adoption of an infant child, made without the consent of the father, who had no notice of the application for the order, and on proof that he had abandoned the infant, the jurisdiction of the surrogate may be properly raised on the allegations that the father had made proper provision for the maintenance of the child and upon his denial of the charge of abandonment.
   [Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 27, 28; Dec. Dig. § 16.*]

4. ADOPTION (§ 7*)—PROCEEDINGS—JURISDICTION.
   Where the father of an infant child left it with his mother, the child's mother being deceased, and displayed a continuing interest in its welfare, though he did not contribute much to its support, no demand being made upon him by the child's grandmother, and his business requiring his absence a large part of the time, there was no such abandonment of the child as to authorize its adoption by its maternal grandparents without the father's consent and without notice to him of the proceedings.
   [Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 7–10; Dec. Dig. § 7.*]

Application for the abrogation of an agreement for the adoption of Leland A. Johnston, a minor.  Granted.

Hastings & Larkin, for Jay Johnston, father.
Henry Donnelly, for foster parents.
Creighton S. Andrews, special guardian, in pro. per.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

DAVIE, S. On the 11th day of January, 1912, Albert A. Allen and Frelove Allen, his wife, appeared before the surrogate and made application for an order confirming an agreement for the adoption by them of their infant grandson, Leland A. Johnston. The mother of the minor was then deceased; but his father, Jay Johnston, the petitioner in this proceeding, is living. He did not appear upon such application, nor did he execute any consent to such adoption, nor did he have any notice of the application; but proof was given that the father had abandoned the child, and an order was accordingly made confirming such adoption. As soon, however, as the father learned of such order, he made an application for abrogation of such adoption, alleging in his moving papers that he had made proper provision for the maintenance of the child with his mother and strenuously controverting the charge of abandonment.

Two questions arise in this controversy.

The first is one of law relating to the method of procedure in an application of this character; the second relates to the merits—that is, as to whether or not the father had abandoned the child, thereby rendering his consent unnecessary under the statute.

Section 110 of the Domestic Relations Law (Consol. Laws 1909, c. 14) defines adoption as:

"The legal act whereby an adult takes a minor into the relation of child, and thereby acquires the rights and incurs the responsibilities of parent in respect to such minor."

Section 111 of the same act provides, among other things, that in order to secure an adoption it is necessary to procure the consent "of the minor, if over twelve years of age, of the foster parent's husband or wife, unless lawfully separated, or unless they jointly adopt such minor," and of the parents or surviving parent of the minor unless such parent has abandoned the child, or certain other conditions exist particularly specified in this section, obviating the necessity of consent.

Section 114 of the act defines the legal effect of such adoption as follows:

"Thereafter the parents of the minor are relieved from all parental duties towards, and of all responsibility for, and have no rights over such child or to his property by descent or succession."

It is also provided that the minor shall take the name of the foster parents, and, while its rights of inheritance and succession from the natural parent remains unaffected, the foster parents and minor sustain towards each other the legal relation of parent and child, including the right of inheritance from each other.

Section 116 of the act provides a method whereby abrogation of an adoption may be obtained, viz., "by the consent of all parties interested"; and section 117 provides for abrogation of an adoption from a charitable institution.

It can hardly be contended that, inasmuch as the statute has prescribed a method of procedure in these two instances, an order confirming adoption cannot be reviewed or abrogated in any other manner.

[1] The county judge and surrogate are given jurisdiction to make an order confirming adoption, and no reason is apparent or even suggested why such an order is exempt from the operation of the provisions of subdivision 6 of section 2481 of the Code of Civil Procedure. This section, defining the incidental power of a surrogate, provides:

"A surrogate, in court or out of court, as the case requires, has power: To open, vacate, modify, or set aside, or to enter, as of a former time, a decree or order of his court; or to grant a new trial or a new hearing for fraud, newly discovered evidence, clerical error, or other sufficient cause."

[2] I am not disposed in this connection to criticise the Allens or question their good faith in asserting abandonment on the part of the father at the time of making application for such adoption. They are the grandparents of the minor, attached to, and feeling great affection for, him. If their zeal in attempting to procure this adoption has occasioned them to misconstrue the acts and attitude of the father toward the child, they may well be excused; it is not necessary to charge them with deceit or willful suppression of the facts in order to secure the relief sought in this proceeding. To confer jurisdiction upon the surrogate to make the order confirming such adoption, it was necessary to obtain the father's consent, or the *fact* of abandonment must exist. In the absence of both, no jurisdiction existed for making the order, and when such lack of jurisdiction is made to appear it is "sufficient cause," within the purview of the statute, for vacating the order.

[3] In Matter of Armstrong, 72 App. Div. 286, 288, 76 N. Y. Supp. 37, 38, the court, in considering the power of the surrogate over his own orders and decrees, says:

"The order and decree having been made without jurisdiction of the parties affected thereby, and being for that reason void, the question arises as to the proper practice to be adopted to have the order and decree annulled of record. A void order or decree may always be attacked collaterally, and without doubt, in this case on an application to revive these proceedings, might be shown to be void and no bar to a revival for that reason. Any attempt to enforce payment of the sum decreed to be paid might be resisted on the same grounds; but the parent apparently affected by the order and decree need not wait to test its validity but by a motion to vacate, may dispose of it."

In Kamp v. Kamp, 59 N. Y. 216, the court said:

"The want of jurisdiction makes the order and judgment of the court, and the record of its action utterly void and unavailable for any purpose, and the want of jurisdiction may always be set up collaterally or otherwise; * * * but he (the party apparently affected) is at liberty, by a more direct and summary proceeding, to have them set aside and vacated."

In Skidmore v. Davies, 10 Paige, 316, the chancellor said:

"If the first order had been irregular as the appellant supposed, his remedy was not by appeal to the chancellor, but an application to the surrogate to set aside the order as irregular was the proper course."

In Vreedenburgh v. Calf, 9 Paige, 129, the court says:

"And if the order was entered when the surrogate had no power to enter such an order, he not only had the right, but it was his duty to set it aside as irregular."

In Pew v. Hastings, 1 Barb. Ch. 454, the court says:

"I think, therefore, the surrogate erred in this case in supposing that he had not the power to open the decree which had been taken by default."

In Seaman v. Whitehead, 78 N. Y. 308, the court says:

"The question arising in such a case relates to the jurisdiction of the surrogate and could properly be raised by a motion to set aside the order upon that ground. If void, it should have been vacated for that reason, and an appeal lies from an order denying the motion to vacate."

In Matter of Trimm, 30 Misc. Rep. 493, 63 N. Y. Supp. 952, and Matter of Moore, 72 Misc. Rep. 644, 132 N. Y. Supp. 249, the proceedings were similar to the one now under consideration. In the first of these cases, Surrogate Marcus of Erie county held that a proceeding to set aside an adoption was the proper remedy. And in Matter of Moore, the county judge held to the same effect.

The method of procedure adopted by the moving party in this case being proper and regular, it only remains to ascertain the fact in regard to the allegation of abandonment.

[4] The facts as disclosed by the evidence are substantially as follows:

Jay Johnston, the father, resides at Shingle House, Pa. He is 30 years of age, in perfect health, of good moral character, a member of the Baptist Church, and a barber by trade. His father died some years ago leaving a widow and five children; the youngest being now the age of nine years. One son, Donald, 21 years old, is in college, and the daughter, 19 years of age, is an operator in a telephone exchange.

Johnston resides with his mother. At the time of the death of Johnston's father, he owned a farm near Shingle House, worth $2,000 and real estate in Virginia recently sold for $6,700. He left no will, and the children became seised of this real estate upon their father's death, subject to the widow's dower therein. The son Jay is indebted to his father's estate in the sum of $500 but still owns an equity in the estate of considerable value. The family still occupies the 85 acres as a home. Jay was married to the daughter of Mr. and Mrs. Allen at Olean, N. Y., February 1, 1905, and for some time thereafter they resided at Shingle House. The boy Leland was born in August, 1906. In August, 1910, Johnston with his wife and child visited relatives in Hornell, N. Y., and from there went to Wellsville, N. Y., where the wife became ill, and she with her husband and child returned to the home of her parents in Olean, where she and the child remained until her death September 23, 1910. After going to Allen's, an estrangement arose between Johnston and his wife. He secured employment as a musician with a show company, left Olean in connection with such employment, and did not return until the day of the wife's funeral. On that day, and after the funeral, Jay had conversation with the Allens regarding the disposition of Leland. Mrs. Allen asserted that on account of her age she did not wish to assume the responsibility of caring for Leland and advised that he be taken to, and cared for at, the house of Mrs. Johnston at Shingle House, and accordingly the father made an arrangement with his

mother for the care of the boy at her home. From that time on, Johnston was away in connection with his business employment the most of the time up to the making of the adoption in question. In the meantime, the boy was provided with a good and comfortable home and well cared for by his grandmother, Mrs. Johnston. He occasionally visited his grandparents, the Allens, with the consent of Mrs. Johnston. During all the time while Johnston was away, he frequently communicated with his mother and sister, often referring to Leland in terms of affection and endearment, indicating a fatherly solicitude for his welfare.

While it appears that he had contributed but little to his mother, in money, toward the expense and maintenance of the child, yet it does not appear that she had ever applied to him for assistance in that respect. It was evidently assumed by the parties that the use of Johnston's share of his father's estate was sufficient compensation to his mother. Such was the situation when the Allens, having the temporary custody of Leland, made application for his adoption. As soon as Mrs. Johnston learned that such proceeding had been taken, she communicated with Johnston, who immediately returned from the West, where he was then employed, and took measures to secure the possession of Leland, and having accomplished that filed his application for abrogation of the adoption. Another circumstance of some importance: On one occasion after Leland had taken up his residence with his grandmother Johnston, Mr. Allen requested Johnston to consent to his adopting the boy, which request Johnston very vigorously and peremptorily refused, so that Allen well understood, when he applied to the surrogate for the order in question, that he was acting in direct antagonism to the wishes of the father. In view of these facts, it would be absurd to hold that the father had abandoned his child within the legal significance of that term. On the contrary, he had made reasonable and ample provision for his welfare, comfort, and maintenance, in the home and under the supervision of his mother. While away he often communicated with his family, and almost invariably referred to Leland. In fact, there is not the slightest proof justifying the inference that Johnston entertained a thought of abandoning his son or permanently severing his natural relations with him or of surrendering his parental authority over him to any other person.

In disposing of this matter, I have fully appreciated and understood the affection of the Allens for their little grandson, and I also realize that the boy's financial interests might be best subserved by permitting the adoption to stand; but this does not affect the question involved.

Johnston had not abandoned his child. Consequently the order of adoption was made without jurisdiction, and, being so made, it must now be vacated, and an order to that effect will accordingly be entered.

Decreed accordingly.